**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

(1) CLOVIA LONG, as Special Guardian of ANTONIO HENDRICKS, an incapacitated adult,

Plaintiff,

v.

(2) BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY;
(3) OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY;
(4) JAMI MCHATTON, L.P.N.;
(5) GABRIEL STASILLI, L.P.N.; AND
(6) JOHN AND JANE DOES 1–10, in their individual capacities,

Defendants.

Case No.: ____________________

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

# COMPLAINT

Plaintiff Clovia Long, as Special Guardian of Antonio Hendricks, an incapacitated adult, for her Complaint against the above-named Defendants, alleges as follows:

## I.

## INTRODUCTION

1. Antonio Hendricks was eighteen years old, healthy, and fully independent when Oklahoma City police arrested him after a traffic stop on the evening of October 10, 2025.

2. He spent nineteen hours and eleven minutes in the Oklahoma County Detention Center (the Jail). During that time, jail medical staff recorded that he showed

strange behavior and statements, that he had urinated on himself and on the floor, and that he would not respond when asked his own name. They entered three Priority 1 referrals for urgent assessment. No one acted on any of them.

3. At 2:25 p.m. on October 11, 2025, the Jail booked him out of custody. Two minutes later, it called 911. Firefighters found him still inside the Jail, sitting on a bench, responding only to painful stimuli.

4. At SSM Health St. Anthony Hospital, a CT scan showed a 48-cubic-centimeter hemorrhage in his brain, with seven millimeters of midline shift. He left the hospital nine days later unable to speak. He remains an incapacitated adult.

5. This action seeks redress under 42 U.S.C. § 1983.

## II.

## PARTIES

6. Plaintiff Clovia Long is a citizen of Oklahoma. She is Antonio Hendricks's mother.

7. On November 4, 2025, the District Court of Oklahoma County appointed Ms. Long special guardian of the person and the estate of Antonio Davontae Hendricks, an incapacitated adult, in Case No. PG-2025-836. That appointment remains in effect, and she brings this action in that capacity.

8. Antonio Davontae Hendricks was born in 2007. He was eighteen years old at all times relevant to this Complaint.

9. Defendant Board of County Commissioners of the County of Oklahoma (the Board) is the body through which Oklahoma County sues and is sued under 19 O.S. § 4.

10. Under 57 O.S. § 41, the Board has a non-delegable duty, at the expense of the County, to provide a jail for the safekeeping of prisoners lawfully committed. That duty includes appropriating funds for the Jail's operation, or alternatively, relocating the population to an appropriate facility. Section 41 expressly permits the County to meet that duty through "access to a jail in another county."

11. Defendant Oklahoma County Criminal Justice Authority (OCCJA) is a public trust created in 2019 under Oklahoma law. Since July 2020, OCCJA has operated the Oklahoma County Detention Center at 201 North Shartel Avenue, Oklahoma City, Oklahoma.

12. Turn Key Health Clinics, LLC provided medical care at the Jail under contract until October 9, 2024. Beginning October 10, 2024, OCCJA brought the Jail's medical and mental-health services in-house and hired approximately sixty-two of Turn Key's former employees to provide them.

13. On information and belief, at all times relevant to this Complaint, OCCJA directly employed the medical and mental-health staff at the Jail, set their protocols, supervised them, and controlled the Jail's electronic medical record. The Jail's initial booking medical form bears the Jail's medical logo and the name of OCCJA's chief executive officer.

14. Defendant Jami McHatton is, on information and belief, a resident of Oklahoma. At all relevant times she was a Licensed Practical Nurse, Oklahoma License No. L0065464, employed by OCCJA at the Jail. She is sued in her individual capacity.

15. Defendant Gabriel Stasilli is, on information and belief, a resident of Oklahoma. At all relevant times he was a Licensed Practical Nurse, Oklahoma License No.

L0066604, employed by OCCJA at the Jail. The Jail's records spell his name "Stastilli." He is sued in his individual capacity.

16. Defendants John and Jane Does 1 through 10 are OCCJA employees whose names Plaintiff does not yet know. They include the Jail medical staff on duty during Antonio's detention, the staff responsible for observing detainees on mental health observation, the staff who processed and carried out his release, and the physicians responsible for supervising the Jail's medical staff. They are sued in their individual capacities. Plaintiff will amend to name them when they are identified.

17. At all relevant times, each individual Defendant acted under color of state law and within the scope of employment with OCCJA.

## III.

## JURISDICTION AND VENUE

18. This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in Oklahoma County, Oklahoma.

## IV.

## FACTUAL ALLEGATIONS

### A. ANTONIO HENDRICKS BEFORE OCTOBER 10, 2025

20. Before his arrest, Antonio lived at home with his parents.

21. On information and belief, Antonio had never had a brain injury or a stroke, and there is no family history of sudden bleeding in the brain.

22. His treating neurologists recorded no known hypertension.

23. Antonio was fully independent. He walked, spoke, drove, and cared for himself without help.

24. His treating physicians recorded his pre-morbid Modified Rankin Scale score, a standard measure of neurologic disability, as zero, which means no symptoms at all.

### B. THE ARREST AND BOOKING

25. On the evening of October 10, 2025, Oklahoma City police officers stopped the car Antonio was driving in a parking lot at 4329 SE 44th Street in Oklahoma City.

26. According to the probable cause affidavit, Officer Wallace made contact with Antonio in the driver's seat, removed him from the car, escorted him to the patrol car, and removed a firearm from his waistband.

27. The affidavit describes no resistance, no struggle, and no use of force.

28. On information and belief, police body camera footage of the arrest shows Antonio walking and speaking normally.

29. Antonio was arrested at 6:50 p.m. and booked into the Jail at 7:15 p.m. on October 10, 2025, under Booking No. 140103590. He was booked on one felony charge and two traffic misdemeanors.

### C. THE INTAKE SCREENING AND THE FIRST TWO PRIORITY 1 REFERRALS

30. At 7:23 p.m., Jail medical staff took Antonio's vital signs.

31. At 7:27 p.m., Defendant McHatton performed Antonio's intake medical screening in the Jail's CorEMR electronic medical record.

32. The screening asked: "Does the patient appear to be sad, irritable, emotionally flat, hallucinating, or showing signs of other mental illnesses such as acting strange or any unusual behavior?" McHatton answered: "Yes (STRANGE BEHAVIOR AND STATEMENTS )."

33. McHatton recorded Antonio's appearance as "Disheveled" and his behavior as "Other."

34. McHatton recorded that Antonio's state of consciousness was "Alert" and that he was able to answer coherently.

35. McHatton recorded that Antonio took no medication, had no chronic conditions, and was not prescribed any medication for a mental health condition.

36. In response to the question asking for the name of Antonio's psychiatrist or mental health treatment center, McHatton recorded "ANXIETY."

37. McHatton recorded that Antonio had no injuries from before or during his arrest.

38. McHatton recorded an emergency contact for Antonio, his stepmother, with her telephone number.

39. McHatton classified Antonio for "Mental Health Observation" housing.

40. At 7:27 p.m., McHatton created a referral in CorEMR categorized "MTH - Urgent Referral MH" with the description "MHO STATUS 1ST TIME IN JAIL." She assigned it Priority 1, the highest priority on the system's scale of 1 to 5.

41. At 7:28 p.m., McHatton created a second referral, categorized "MTH - Psychiatrist," with the description "MHO STATUS ANXIETY REQUESTING MEDS." She also assigned it Priority 1.

42. McHatton also placed a "Mental Health Observation" alert on Antonio's chart.

43. Neither referral was ever completed. Each states "Appointment Completed By: N/A."

44. Antonio's chart reflects no referral to a physician, physician assistant, or nurse practitioner, and no contact with an on-call provider, at intake or at any later time.

45. McHatton also completed the Jail's Initial Booking Medical/Mental Health Placement Form. She marked "Mental Health Observation (MHO)" and left the entire Medical Placement section blank.

46. On the Jail's Pat-Down Sheet, the entry "Medically Cleared for Admission" is marked "Accepted." McHatton's signature appears on the line for "Medical Screen Completed."

47. The booking form's checklist for the reviewing jail lieutenant, which includes the entry "Medical screen completed by County Nurse," is blank. The form bears no booking authorization signature.

### D. The Bond

48. On information and belief, Antonio's family arranged his bond on the evening of October 10, 2025, and the bond was posted at approximately 1:30 a.m. on October 11, 2025.

49. The bond was a $3,000 surety bond written by Rodney Floyd of Rodney's Bail Bonds and dated October 11, 2025.

50. The Jail did not release Antonio until 2:25 p.m., approximately thirteen hours after the bond was posted.

### E. THE 5:58 A.M. CHART NOTE AND THE THIRD PRIORITY 1 REFERRAL

51. At 5:52 a.m. on October 11, 2025, Jail medical staff took Antonio's vital signs.

52. At 5:58 a.m., Defendant Stasilli entered a chart note. It is the only narrative note in Antonio's Jail medical record. It reads in full: "PT WAS ASSESSED ON THEBENCH NEAR COURT HOLDING FOR BIZARRE BEHAVIOR. PT URINATED ON HIMSELF AND ON THE FLOOR. PT WAS ASKED SEVERAL TIMES HIS NAME AND IF HE WAS OK, YET HE WOULDN'T RESPOND. PT's VITALS TAKEN, WNL AND CHARTED IN FLOWSHEET. PT IS CURRENTLY TASKED FOR M.H."

53. At 6:00 a.m., Stasilli created a third referral, categorized "MTH - Urgent Referral MH," with the description "PLEASE ASSESS PT FOR UNUSUAL BEHAVIOR. PT ISN'T RESPONDING TO STAFFS QUESTIONS. THIS IS HIS FIRST TIME IN JAIL." He assigned it Priority 1.

54. Stasilli sent the referral to mental health. Antonio's chart reflects no contact by Stasilli with a physician, physician assistant, nurse practitioner, or on-call provider, and no transfer to a hospital.

55. The third referral was never completed. It states "Appointment Completed By: N/A."

56. An eighteen-year-old who has urinated on himself and on the floor, and who will not respond when asked his own name, has an obvious need for medical evaluation. Incontinence and unresponsiveness are recognized signs of a neurologic emergency, including bleeding in the brain.

57. The Jail's own record documents Antonio's decline. At 7:27 p.m. on October 10, it recorded him as alert and able to answer coherently. At 5:58 a.m. on October 11, it recorded that he had urinated on himself and would not respond when asked his name.

58. Antonio's chart contains no entry of any kind between 6:00 a.m. and his release at 2:25 p.m.

### F. No provider ever saw him

59. No physician, physician assistant, nurse practitioner, psychiatrist, or mental health professional saw Antonio at any time during his detention.

60. No one at the Jail ordered imaging, performed a neurologic examination, or contacted the on-call provider.

61. Antonio's CorEMR chart reports "(No Records)" for Medical Forms, Release Forms, Patient History Forms, Subjective Interview Forms, Patient Request Forms, Education Forms, Custom Flows, Medications, the Medication Administration Record, Problems, Blood Glucose Levels, Medical Sick Calls, Mental Health Sick Calls, Lab Results, and Radiology Results.

### G. The release

62. At 2:25 p.m. on October 11, 2025, after nineteen hours and eleven minutes in custody, the Jail released Antonio from custody.

63. The field on the Jail's Detailed Release Report labeled "Reason For Release" is blank. The release code reads "RELEASED."

64. Antonio's chart reflects no medical evaluation and no medical clearance before his release.

65. At 2:27 p.m., two minutes after the recorded release, the Jail called 911 for a sick call at the Jail.

66. When the Oklahoma City Fire Department crew arrived, it could not reach Antonio until Jail staff opened the gate.

67. The crew found Antonio still inside the Jail, sitting on a bench, with Jail staff at his side.

68. At 2:40 p.m., the crew recorded that Antonio responded only to painful stimuli and scored him 8 on the Glasgow Coma Scale, on which a fully alert person scores 15.

69. A Jail nurse told the crew that Antonio “WAS JUST BROUGHT INTO THE JAIL AND STARTED TO BECOME DROWSY AND SLOW TO RESPOND.”

70. That statement was false. Antonio had been in the Jail’s custody for more than nineteen hours.

71. Jail staff told the transporting ambulance crew that Antonio had “altered mental status and right sided weakness.”

72. Jail staff also told the ambulance crew that Antonio had been arrested that morning and that his condition had declined since that afternoon. Both statements were false. He was arrested the previous evening, and Jail medical staff had documented incontinence and unresponsiveness at 5:58 a.m.

73. The ambulance crew recorded that Antonio “is now being released, requiring medical attention.”

74. No Jail employee accompanied Antonio to the hospital.

75. On information and belief, OCCJA did not notify Antonio's mother, his stepmother, or any other family member that he had been taken to the hospital.

### H. The Jail did not report his transfer to the State

76. Oklahoma regulations require a jail to notify the Oklahoma State Department of Health no later than the next working day of any serious injury to an inmate "defined as life threatening or requiring transfer to outside medical facility." Okla. Admin. Code § 310:670-5-2(27)(B).

77. Plaintiff requested from the Department of Health all incident reports from the Jail for October 1 through October 20, 2025.

78. In that period, OCCJA reported to the Department an inmate sent to Integris Southwest by cruiser on October 4, 2025, and an inmate sent to OU Medical Center by ambulance on October 13, 2025.

79. OCCJA did not report Antonio's transfer. The Department's file concerning Antonio contains only a printout of a television news story about him.

80. On information and belief, OCCJA recorded Antonio as released before calling 911 so that his emergency transfer would not be treated as the transfer of an inmate to an outside medical facility.

### I. At the hospital

81. Antonio arrived by ambulance at the SSM Health St. Anthony Hospital emergency department at 2:53 p.m. on October 11, 2025, twenty-eight minutes after the recorded release.

82. On information and belief, because the Jail had told the crews that Antonio was newly arrived and had only recently declined, the transporting crew told the emergency department that he was "pretending to be non responsive."

83. A CT scan of Antonio's head showed a 48-cubic-centimeter hemorrhage in the left basal ganglia, with mass effect and seven millimeters of midline shift.

84. The radiologist's impression stated: "Finding may suggest active hemorrhage superimposed on acute hemorrhage or acute on subacute hemorrhage."

85. The consulting neurosurgeon reviewed the scan and recorded that the hemorrhage "looks subacute."

86. A CT scan on October 18, 2025 described the bleed as a "mixed age hematoma."

87. A CT angiogram on October 11, 2025 found "No intracranial arterial aneurysm or vascular malformation."

88. Antonio was admitted to the intensive care unit, where he remained until October 18, 2025. He was intubated from October 12 to October 15, 2025.

89. His discharge diagnoses included acute intracerebral hemorrhage, acute encephalopathy, brain compression, and acute respiratory failure. His diagnoses present on admission included intracranial hypertension with brain compression.

90. Antonio was discharged on October 20, 2025 to an inpatient rehabilitation hospital.

91. At discharge, his physicians recorded that he was "awake, nonverbal, follows commands intermittently," with "Complete expressive aphasia."

92. His Modified Rankin Scale score had gone from zero before his arrest to "4-5" at discharge.

93. Antonio remains an incapacitated adult.

### J. THE DELAY CAUSED THE HARM

94. A 48-cubic-centimeter intracerebral hemorrhage with midline shift and intracranial hypertension is a neurosurgical emergency. Prompt imaging, neurosurgical consultation, and intensive-care management limit the secondary brain injury caused by swelling, mass effect, and herniation.

95. On information and belief, the hemorrhage was developing during Antonio's detention, while Jail staff were recording strange behavior, incontinence, and unresponsiveness. The radiologist's finding of possible active bleeding on older blood, the neurosurgeon's assessment that the bleed looked subacute, and the later finding of a mixed-age hematoma are consistent with a hemorrhage that developed over hours.

96. Had any Defendant obtained a provider evaluation for Antonio during his detention, and at the latest when Stasilli documented his incontinence and unresponsiveness at 5:58 a.m., a CT scan would have identified the hemorrhage, and treatment would have begun more than eight hours sooner.

97. The delay caused Antonio substantial harm, including permanent neurologic injury.

### K. OCCJA'S MEDICAL SYSTEM

98. When OCCJA brought medical services in-house on October 10, 2024, it took on responsibility for designing, staffing, training, supervising, and equipping the Jail's

medical operation, including its referral and escalation protocols and its CorEMR electronic medical record. Antonio was booked one year to the day later.

99. Antonio's three Priority 1 referrals remained open, without action, for between eight and nineteen hours before his release.

100. At 12:00 a.m. on October 12, 2025, CorEMR deleted all three referrals. Each was last modified by "System, CorEMR," with the change note "Inmate was released 10-12-2025" and the change note type "Deleted Appointments."

101. At the same moment, the system removed the Mental Health Observation alert from Antonio's chart.

102. The change note misstates the date of release. Antonio was released on October 11, 2025.

103. On information and belief, OCCJA configured CorEMR to delete pending referrals automatically when a detainee is released, rather than to flag, escalate, or preserve them.

104. On October 14, 2025, while Antonio was intubated in the intensive care unit, a Jail employee scanned a "General Consent for Care and Treatment/Informed Consent for Treatment with Psychoactive Medications" into his Jail chart.

### L. THE JAIL'S DOCUMENTED HISTORY BEFORE OCTOBER 2025

105. The Jail's deficiencies were documented for decades before OCCJA assumed control of it.

106. In 1995, an Oklahoma County grand jury reported that leaving entire pods of the Jail without physical supervision for several hours "is a dangerous and alarming practice" and recommended that it "should be terminated immediately."

107. In July 2008, the United States Department of Justice issued findings that conditions at the Jail violated detainees' constitutional rights, including findings of inadequate supervision and staffing and inadequate medical and mental health care.

108. On November 5, 2009, Oklahoma County entered a memorandum of understanding with the Department of Justice concerning conditions at the Jail. It required the County, among other things, to "maintain in working order all cameras, alarms, and other monitoring equipment at the Jail."

109. In 2017, pretrial detainee Maurice Pendleton was beaten to death by other detainees at the Jail after he was locked, with at least four other detainees and no staff supervision, in a converted basketball court. The medical examiner ruled his death a homicide.

110. In July 2019, an Oklahoma County Commissioner publicly stated that "taxpayers have been sued for $20 million due to the Sheriff's Department's negligence" at the Jail.

### M. THE BOARD'S CONTROL OVER THE JAIL'S FUNDING

111. On May 22, 2019, the Board created OCCJA by a Trust Indenture in which the Chairman of the Board acted as trustor.

112. On May 22, 2019, the Board accepted the beneficial interest in the trust on behalf of Oklahoma County.

113. Under the Trust Indenture, the Board chooses or confirms seven of OCCJA's nine trustees.

114. Under the Trust Indenture, the Jail's general fund appropriation is "determined solely by the Oklahoma County Budget Board," whose determination "shall be final."

115. On information and belief, Oklahoma County has elected to operate under the County Budget Act, 19 O.S. §§ 1401–1421.

116. Under the County Budget Act, the county budget board consists of each elected county officer, and the chairman of the board of county commissioners serves as its chairman. 19 O.S. § 1407. All three members of the Board are members of the Budget Board.

117. The Budget Board adopts the budget for each county fund and "may add or increase items or delete or decrease items in each budget." 19 O.S. § 1413(A).

118. If, during the budget year, unforeseen emergencies leave temporarily insufficient money in a particular fund, the Budget Board may amend the budget to transfer money from one fund to another. 19 O.S. § 1420(B).

119. In 2022, the guardian of a detainee injured at the Jail sued the Board in this Court, alleging that the Board maintained a custom of underfunding and understaffing the Jail after OCCJA took over its operation. *Altstatt v. Bd. of Cnty. Comm'rs*, No. CIV-22-811-D (W.D. Okla.).

120. On September 19, 2023, this Court held that the *Altstatt* plaintiff had stated a plausible § 1983 claim against the County for a custom of failing to adequately fund and staff the Jail.

121. On September 6, 2022, OCCJA adopted a resolution asking the Budget Board and the Board for more funding for detention staff pay. OCCJA's chairman stated publicly: "We really need about 400 [employees] to do the proper care of the detainees."

122. In February 2024, founding OCCJA trustee Sue Ann Arnall resigned. Her resignation letter stated: "For years now, I have asked the County Budget Board to allocate enough funds to the jail for it to operate at an adequate level."

123. Ms. Arnall's letter also stated: "It is simply impossible to hire the necessary number of detention officers at the current starting salary and the funds approved and allocated to the jail by the Oklahoma County Budget Board."

124. On information and belief, when Turn Key ended its medical contract at the Jail in 2024, it stated that the Jail did not have enough detention staff to give its medical staff access to detainees who needed care.

125. When OCCJA brought medical care in-house in October 2024, the wages of its medical staff were paid from the savings from the cancelled Turn Key contract.

126. On June 27, 2025, OCCJA announced a projected budget shortfall of $5.8 million and stated that the Jail would run out of operating funds by August 1, 2025.

127. On September 18, 2025, twenty-two days before Antonio was booked, the Jail's chief executive told the Budget Board that the Jail held about 1,700 detainees with 117 detention officers.

128. On September 18, 2025, the Budget Board approved a 3.2 percent raise for other county agencies and no raise for detention officers.

129. On September 18, 2025, the Budget Board voted down a proposal to move $1.5 million in federal relief interest to the Jail.

130. At that September 18, 2025 meeting, one county commissioner said there was a "dire need" for a jail pay increase, and another said: "I think the jail is an emergency and we know it's happening now."

**N. DEATHS AND NOTICE UNDER OCCJA**

131. Sixteen detainees died in the Jail's custody in 2022, seven in 2023, and seven in 2024. By mid-May 2025, seven more had died.

132. Parker James Stephens was found dead in his cell at the Jail on February 3, 2021.

133. On January 27, 2022, counsel for Parker Stephens's estate filed a notice of tort claim against OCCJA with the Oklahoma County Clerk. It stated that the Jail "has a long history of unexplained inmate deaths" and that "unabated unconstitutional conditions at the Jail long pre-date the death of Parker Stephens."

134. Kyle Steven Shaw was found unresponsive on the floor of his cell at the Jail at approximately 4:49 a.m. on February 13, 2022, and died.

135. In February 2023, counsel for Kyle Shaw's family served a notice of tort claim on OCCJA concerning his death.

136. Corey McMichael was a detainee at the Jail whose health deteriorated in June 2022. Despite requests by Mr. McMichael and his cellmate, he was not given medical care, and he was sick for at least a week before he was treated. He was transferred to a hospital on June 27, 2022 and died on July 2, 2022.

137. In June 2023, counsel for Corey McMichael's family served a notice of tort claim on OCCJA concerning his death.

138. Gary L. Stephens was a detainee at the Jail on or about December 3, 2023. While at the Jail, he showed visible signs of facial droop, confusion, and left-sided weakness. He later died of complications of an untreated aneurysm.

139. On December 2, 2024, counsel for Gary Stephens's estate served a notice of tort claim on OCCJA. It stated that the health care professionals responsible for Mr. Stephens at the Jail "failed to properly diagnose and treat" him even though he "showed visible signs of facial droop, confusion and left-sided weakness."

140. The Stephens notice put OCCJA on written notice, ten months before Antonio's detention and after OCCJA had taken over medical care at the Jail, that medical staff at the Jail had failed to recognize a neurologic emergency in a detainee with confusion and visible neurologic signs.

141. OCCJA produced each of these notices in response to Plaintiff's open records request for notices of tort claim it had received concerning events at the Jail.

## O. State inspections before October 2025

142. By October 2025, the Jail had failed eleven consecutive inspections by the Oklahoma State Department of Health.

143. In June and July 2024, OCCJA refused to allow Department of Health inspectors to enter the Jail for unannounced inspections. The Jail failed two inspections because of those refusals.

144. In July 2024, the Department of Health issued an order requiring OCCJA to give its inspectors access to the Jail.

145. On July 29, 2024, OCCJA sued the Department of Health in the District Court of Oklahoma County, Case No. CV-2024-2088, seeking to stop unannounced inspections.

146. On May 28, 2025, the Oklahoma Supreme Court held that the Department of Health may conduct unannounced inspections of the Jail.

147. On information and belief, in September 2025 the Jail had approximately 360 employees, of whom only 134 were detention officers.

### P. The same failures continued after Antonio's detention

148. The facts in this section postdate Antonio's detention. Plaintiff pleads them not as notice but as evidence that the customs described above were persistent and continuing.

149. In May 2026, the Department of Health again found the Jail out of compliance. Reviewing twenty logbooks for April 7 through May 4, 2026, inspectors found that at least 2,400 required sight checks either did not occur or were not properly documented. More than 1,900 of them involved detainees on suicide watch or otherwise requiring heightened observation.

150. The same inspection found that at least nine detainees had sustained serious injuries and been transferred to outside medical facilities without OCCJA notifying the Department of Health.

151. These conditions were persistent and well settled. OCCJA's final policymakers knew of them through inspection reports, incident reports, notices of tort claim, litigation, and public reporting, and did not correct them.

## V.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF

**Deliberate Indifference to Serious Medical Needs (Fourteenth Amendment)**
**42 U.S.C. § 1983**
**McHatton, Stasilli, and Does 1–10**

152. Plaintiff incorporates paragraphs 1 through 151 as if fully set forth herein.

153. As a pretrial detainee, Antonio had a right under the Fourteenth Amendment to adequate medical care and to be free from deliberate indifference to his serious medical needs. The Tenth Circuit applies the Eighth Amendment deliberate-indifference standard to that right.

154. Antonio's medical need was objectively serious. An expanding intracranial hemorrhage is life-threatening. Its signs here, strange behavior and statements, incontinence, failure to respond to his own name, and right-sided weakness, were so obvious that even a lay person would easily recognize the need for a doctor's attention.

155. Defendant McHatton knew of a substantial risk to Antonio's health. She personally recorded his strange behavior and statements, classified him for mental health observation, and marked two referrals Priority 1, the highest urgency the Jail's system allows.

156. McHatton disregarded that risk. Having judged that Antonio needed urgent assessment, she did not obtain an evaluation by a physician, physician assistant, or nurse practitioner, did not contact the on-call provider, and did not reassess him or confirm that either referral was acted on.

157. Defendant Stasilli knew of a substantial risk to Antonio's health. He personally observed and recorded that Antonio had urinated on himself and on the floor and would not respond when asked his name, and he marked a third referral Priority 1.

158. Stasilli disregarded that risk. He sent the referral to mental health, did not obtain an evaluation by any provider, did not contact the on-call provider, and did not send Antonio to a hospital. No one acted for the next eight and a half hours.

159. McHatton and Stasilli served as gatekeepers between Antonio and the providers who could diagnose and treat him. Each recognized that he needed urgent attention, and each failed to fulfill that role.

160. Defendants Does 1–10, the Jail medical staff on duty and the staff responsible for observing Antonio while he was on mental health observation, saw or were told of his condition, had access to his chart and its Priority 1 referrals and Mental Health Observation alert, and did nothing to obtain medical care for him.

161. Each of these Defendants acted with deliberate indifference. The delay they caused resulted in substantial harm to Antonio, including permanent neurologic injury.

162. Their conduct was reckless and callously indifferent to Antonio's federally protected rights, entitling Plaintiff to punitive damages against them.

## SECOND CLAIM FOR RELIEF

**Deliberate Indifference (Fourteenth Amendment)**
**42 U.S.C. § 1983**
**Release of a Detainee in Medical Crisis**
**Does 1–10**

163. Plaintiff incorporates paragraphs 1 through 151 as if fully set forth herein.

164. When the Jail booked Antonio out of custody at 2:25 p.m., he was on mental health observation, had three open Priority 1 referrals, and had been documented as incontinent and unresponsive. Two minutes later, he was responding only to painful stimuli.

165. Defendants Does 1–10, including the staff who processed and carried out Antonio's release and the Jail nurse and staff who attended him on the bench, knew that he was in a medical crisis. Jail staff described his condition as "altered mental status and right sided weakness."

166. Rather than obtain emergency care for Antonio while he was in custody, these Defendants booked him out of custody first and only then called 911.

167. These Defendants then gave the responding crews a false history: that Antonio had just been brought into the Jail and had only recently declined. On information and belief, that false history led the transporting crew to report that Antonio was pretending to be unresponsive and delayed his evaluation and treatment at the hospital.

168. These Defendants acted with deliberate indifference to a known and substantial risk of serious harm. Their conduct caused Antonio substantial harm, including further delay in treating his hemorrhage.

169. Their conduct was reckless and callously indifferent to Antonio's federally protected rights, entitling Plaintiff to punitive damages against them.

## THIRD CLAIM FOR RELIEF

**Entity Liability for Unconstitutional Policy or Custom**
**42 U.S.C. § 1983**
**Oklahoma County Criminal Justice Authority**

170. Plaintiff incorporates paragraphs 1 through 151 as if fully set forth herein.

171. OCCJA is liable under § 1983 when its policy or custom is the moving force behind a violation of a detainee's constitutional rights.

172. OCCJA maintained a widespread, persistent, and well-settled custom of failing to act on urgent medical and mental-health referrals.

173. OCCJA maintained a custom of routing detainees with acute changes in behavior and responsiveness to mental health rather than to a medical provider for evaluation.

174. OCCJA maintained a custom of failing to observe and check on detainees classified as requiring heightened observation.

175. OCCJA maintained a custom of releasing detainees in medical crisis from custody before obtaining emergency care for them, and of failing to report their transfers to outside medical facilities to the Department of Health.

176. OCCJA's final policymakers knew of these customs through the deaths, notices of tort claim, failed inspections, and other facts alleged above, and were deliberately indifferent to the substantial risk they posed to detainees.

177. These customs were the moving force behind the violations of Antonio's rights alleged in the First and Second Claims for Relief and caused his injuries.

## FOURTH CLAIM FOR RELIEF

**Entity Liability for Failure to Train and Supervise**
**42 U.S.C. § 1983**
**Oklahoma County Criminal Justice Authority**

178. Plaintiff incorporates paragraphs 1 through 151 as if fully set forth herein.

179. OCCJA failed to train its medical and detention staff to recognize that acute changes in behavior, unresponsiveness, and incontinence require evaluation by a medical provider rather than only a mental health classification.

180. OCCJA failed to train its staff on escalating Priority 1 referrals that are not acted on, and on obtaining provider evaluation or emergency transfer for a detainee in medical distress.

181. OCCJA failed to supervise its medical operation, including by allowing Priority 1 referrals to remain open without action, audit, or escalation.

182. The need for this training and supervision was obvious. OCCJA knew that its staff would encounter detainees whose medical emergencies first appear as changes in behavior, and that a wrong choice in that situation would predictably cause serious injury or death. The Gary Stephens notice told OCCJA so in writing.

183. OCCJA's failure to train and supervise reflected deliberate indifference to detainees' constitutional rights and was the moving force behind the violations of Antonio's rights alleged in the First and Second Claims for Relief.

## FIFTH CLAIM FOR RELIEF

### Entity Liability for Systemic Deficiencies in Medical Care
### 42 U.S.C. § 1983
### Oklahoma County Criminal Justice Authority

184. Plaintiff incorporates paragraphs 1 through 151 as if fully set forth herein.

185. A governmental entity is liable under § 1983 when systemic and gross deficiencies in its staffing, facilities, equipment, or procedures make it effectively impossible for detainees to obtain needed medical care, and the entity is deliberately indifferent to that result.

186. OCCJA's system for medical referrals generated no alert, no notice to a provider, and no escalation when a Priority 1 referral went unanswered. Antonio's three Priority 1 referrals remained open for between eight and nineteen hours without action.

187. On information and belief, OCCJA configured its electronic medical record to delete pending referrals automatically when a detainee is released, which erased the record of unanswered referrals and prevented any review of them.

188. OCCJA maintained no procedure by which nursing staff were expected or able to obtain a provider evaluation for a detainee showing acute neurologic signs.

189. OCCJA maintained no procedure requiring that a detainee with acute changes in behavior and no known psychiatric treatment be evaluated for a medical cause before being classified as a mental health matter.

190. OCCJA maintained no procedure requiring medical assessment or clearance before releasing a detainee, including a detainee on mental health observation with pending Priority 1 referrals. Antonio's chart reports "(No Records)" under Release Forms.

191. OCCJA operated the Jail with staffing far below its needs.

192. These deficiencies were features of the system OCCJA designed and operated, not isolated lapses. OCCJA knew of them and was deliberately indifferent to them. They were the moving force behind the deprivation of Antonio's right to adequate medical care and caused his injuries.

## SIXTH CLAIM FOR RELIEF

### Entity Liability for Underfunding and Understaffing the Jail
### 42 U.S.C. § 1983
### Board of County Commissioners of the County of Oklahoma

193. Plaintiff incorporates paragraphs 1 through 151 as if fully set forth herein.

194. Oklahoma County, acting through the Board, is a person subject to suit under 42 U.S.C. § 1983.

195. The Board's duty to provide a jail for the safekeeping of prisoners includes appropriating the funds needed to operate it, or alternatively, relocating the population to an appropriate facility. The Board could not delegate away its responsibility for the jail system it created by placing the Jail in a public trust.

196. Oklahoma County, acting through the Board and the Budget Board, maintained a policy or custom of underfunding and understaffing the Jail, including its detention staff and its medical operation.

197. The County's funding policy for the Jail was made by the Board, which is responsible under 57 O.S. § 41 for providing the Jail at the County's expense, and by the Budget Board, which adopts the County's budgets under 19 O.S. § 1413 and whose determination of the Jail's general fund appropriation is final under the Trust Indenture.

198. In the alternative, if the Budget Board rather than the Board was the County's final policymaker for funding the Jail, the Budget Board's funding decisions were

the County's policy, and the County is liable for them through the Board, the name in which the County is sued under 19 O.S. § 4.

199. The Board knew, through decades of reports, grand jury findings, federal findings, failed state inspections, notices of tort claim, litigation in this Court, and OCCJA's own repeated funding requests, that the Jail was so understaffed and underfunded that detainees could not reliably obtain observation or medical care.

200. Constitutional violations like those Antonio suffered were the highly predictable and plainly obvious consequence of that policy or custom, and the Board was deliberately indifferent to that risk.

201. The Board's policy or custom was a moving force behind the failures alleged above, including the failure to observe Antonio while he was on mental health observation, the failure to act on his three Priority 1 referrals, the absence of any provider evaluation, and his release in medical crisis, and it caused his injuries.

202. In the alternative, if OCCJA lacked the funding and authority needed to operate the Jail safely, that is because the Board failed to provide them.

**VI.**

**DAMAGES**

203. As a direct and proximate result of Defendants' conduct, Antonio suffered permanent brain injury; loss of speech and cognitive function; physical pain and mental anguish; past and future medical, hospital, rehabilitation, and attendant-care expenses; loss of earning capacity; and loss of the enjoyment of life.

204. Antonio requires ongoing care and remains an incapacitated adult.

## VII.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendants on each claim;

B. Award compensatory damages in an amount to be proven at trial;

C. Award punitive damages against the individual Defendants;

D. Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

E. Award pre- and post-judgment interest as allowed by law; and

F. Grant such other and further relief as the Court deems just and equitable.

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

BRYAN & TERRILL

By: *s/J. Spencer Bryan*
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
Tele/Fax: (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com